# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

* * *

| | |
|---|---|
| TRANSFIRST GROUP, INC., *et al.*, | Case No. 2:17-cv-00487-APG-VCF |
| Plaintiffs, | **ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION** |
| v. | **AND** |
| DOMINIC J. MAGLIARDITI, *et al.*, | **PRELIMINARY INJUNCTION** |
| Defendants. | (ECF No. 6) |

Plaintiffs Transfirst Group, Inc.; Transfirst Third Party Sales, LLC; and Payment Resources International, LLC ("Transfirst") obtained a judgment in the United States District Court for the Northern District of Texas against defendant Dominic J. Magliarditi based on fraud claims for which approximately $4 million remains unpaid. ECF No. 7-1 at 2, 5, 11; Pls.' Hrg. Exs. 1-3; ECF No. 105 at 17. Transfirst has been attempting to collect ever since, with little success. Following post-judgment collection efforts, Transfirst initiated this lawsuit against Dominic, his wife (Francine Magliarditi), and various entities associated with the Magliarditis, alleging that the entities are Dominic's alter egos and thus are liable on the judgment. Transfirst also asserts fraudulent transfer claims, alleging that transfers between the entities and to Francine were fraudulent.

While this case was still pending in Texas, Transfirst moved for a temporary restraining order ("TRO") precluding the defendants from transferring, concealing, or otherwise disposing of their assets. ECF No. 6. The Texas court granted that motion as to some defendants but denied it without prejudice as to others because the court concluded it lacked jurisdiction over those defendants. ECF Nos. 6, 33. In ruling on the TRO motion, the court stated Dominic had engaged in "postjudgment discovery abuses, as evidenced by Magistrate Judge Paul Stickney's order sanctioning him . . . ." ECF No. 33 at 9. The Texas court then transferred the action to this court. ECF Nos. 36, 37.

After the case was transferred, I reinstated the TRO, expanded it to apply to all the defendants, and set the motion for preliminary injunction for an evidentiary hearing. ECF Nos. 53, 54.  In the meantime, Transfirst filed a second amended complaint, again asserting claims for alter ego, fraudulent transfer, and unjust enrichment. ECF No. 75.  The parties submitted their briefs and voluminous supporting exhibits in relation to the motion for a preliminary injunction.  I held an evidentiary hearing on May 19, 2017, at which no live witnesses testified.

I grant Transfirst's motion for a preliminary injunction.  Transfirst has shown a likelihood of success on its claim that the entities are Dominic's alter egos and thus are liable on the judgment.  Transfirst also has shown a likelihood of success on the merits that the entities have made fraudulent transfers between themselves and to Francine.  Transfirst has shown a likelihood of irreparable harm because Dominic has engaged in tactics designed to frustrate collection of the judgment and he likely will continue to do so unless restrained.  The balance of hardships favors Transfirst because it has been unable to collect on its judgment and the defendants have not shown they will be harmed by the injunction.  Further, any harm has been caused by the defendants' own conduct.  Finally, an injunction supports the public interest in ensuring valid judgments are enforced and not fraudulently evaded.  I deny Transfirst's request to appoint a receiver and I deny the defendants' request to increase the bond.

## I. PRELIMINARY INJUNCTION STANDARD

To qualify for a preliminary injunction, a plaintiff must demonstrate: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm, (3) the balance of hardships favors the plaintiff, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Alternatively, the plaintiff must demonstrate (1) serious questions on the merits, (2) a likelihood of irreparable harm, (3) the balance of hardships tips sharply in the plaintiff's favor, and (4) an injunction is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

/ / / /

/ / / /

## II.  LIKELIHOOD OF SUCCESS ON THE MERITS

### A.  Alter Ego

Under Nevada law,[1] corporations "are generally to be treated as separate legal entities." *LFC Mktg. Grp., Inc. v. Loomis*, 8 P.3d 841, 845 (Nev. 2000).  But Nevada recognizes the "equitable remedy of 'piercing the corporate veil' . . . in circumstances where it appears that the corporation is acting as the alter ego of a controlling individual." *Id.*  Nevada also recognizes "reverse piercing" where a creditor may reach a corporation's assets "to satisfy the debt of a corporate insider based on a showing that the corporate entity is really the alter ego of the individual." *Id.* at 846.  "Indeed, [i]t is particularly appropriate to apply the alter ego doctrine in 'reverse' when the controlling party uses the controlled entity to hide assets or secretly to conduct business to avoid the pre-existing liability of the controlling party." *Id.* (quotation omitted).

The "'essence' of the alter ego doctrine is to 'do justice' whenever it appears that the protections provided by the corporate form are being abused." *Id.* at 845-46.  But "[t]he corporate cloak is not lightly thrown aside" and "the alter ego doctrine is an exception to the general rule recognizing corporate independence." *Id.* at 846 (quotation omitted).

#### 1.  Alter Ego is a Claim Under These Circumstances.

As an initial matter, the defendants argue that alter ego is a remedy, not an independent claim.  They thus contend Transfirst cannot obtain a preliminary injunction based on a likelihood of success of showing alter ego.  Transfirst contends it may assert alter ego as an independent claim where, as here, it is a judgment creditor claiming the entities are liable on the judgment as the judgment debtor's alter egos.

While it often will be the case that alter ego is a remedy for another claim,[2] the Supreme Court of Nevada has referred to alter ego as a "claim" in the context of a judgment creditor

---

[1] The parties agree Nevada law applies to the alter ego analysis in this case.

[2] *See Local 159, 342, 343 & 444 v. Nor-Cal Plumbing, Inc.*, 185 F.3d 978, 985 (9th Cir. 1999) (referring to alter ego as a remedy, not a claim); *OfferHubb.net, Inc. v. Fun Club USA, Inc.*, No. 2:14-CV-00190-RFB-GWF, 2015 WL 4508728, at *4 (D. Nev. July 24, 2015) (same); *Elie v. Ifrah PLLC*, No. 2:13-CV-888-JCM-VCF, 2014 WL 547958, at *7 (D. Nev. Feb. 10, 2014) (same); *Taddeo v. Taddeo*, No. 2:08-CV-01463-KJD-RJJ, 2011 WL 4074433, at *8 (D. Nev. Sept. 13, 2011) (same).

asserting alter ego in aid of execution of a judgment. In *Callie v. Bowling*, the Supreme Court of Nevada overruled a prior case that suggested that a judgment creditor could amend a judgment to make another entity liable as the alter ego of the judgment debtor. 160 P.3d 878, 880 (Nev. 2007) (en banc). The court "clarif[ied] that a motion to amend a judgment is not the proper vehicle by which to allege an alter ego claim." *Id.* Instead, a "party who wishes to assert an alter ego claim must do so in an independent action against the alleged alter ego with the requisite notice, service of process, and other attributes of due process." *Id.* at 881. *Callie* thus refers to alter ego as a "claim" and invites judgment creditors to file a separate action to assert it when they are attempting to collect the judgment debtor's assets that are in another party's hands whom the creditor contends is an alter ego.

This is consistent with *Mona v. Eighth Judicial District Court of the State of Nevada in and for The County of Clark*, 380 P.3d 836, 841 (Nev. 2016) (en banc). There, the Supreme Court of Nevada similarly concluded that a judgment creditor who domesticates a judgment cannot attach a third party's assets as an alter ego through Nevada's procedures for judgment debtor exams and related sanctions. Instead, the court referred to Nevada's procedures governing execution on a judgment. *Id.* (citing Nevada Revised Statutes ("NRS") §§ 21.010-.260). Under those procedures, a judgment creditor must bring a separate action if a third party claims an adverse interest in the property. *Id.* at 841-42 (stating that "NRS 21.330 permits a judgment creditor to institute [a separate] action against the third parties with adverse claims to the property of a judgment debtor") (quotation omitted).

Under *Callie* and *Mona*, a judgment creditor may not resort to summary procedures that do not afford due process to a third party claimant when seeking to attach the assets of an alleged alter ego. But those concerns are not at issue here because Francine and the entity defendants have been named and served in this lawsuit.[3] Transfirst thus is doing what the Supreme Court of

---

[3] Both *Callie* and *Mona* were in the context of collection efforts on a domesticated judgment. Although there is no evidence before me that Transfirst has domesticated the judgment, Nevada's Uniform Enforcement of Foreign Judgments Act does not require it to do so. Instead, a "judgment creditor may elect to bring an action to enforce his or her judgment instead of proceeding under NRS 17.330 to 17.400, inclusive." Nev. Rev. Stat. § 17.390.

Nevada has indicated a judgment creditor seeking judgment debtor assets in third party hands

should do: file a separate action for alter ego and afford due process to the third party.

### 2. Alter Ego Applies to Limited Liability Companies, Trusts, and Partnerships.

The defendants argue alter ego does not apply to Francine, limited liability companies

("LLCs"), partnerships, or trusts.  In short, they argue it applies solely to a corporation, which in

this case would be only defendant DII Capital, Inc.  Transfirst concedes alter ego does not apply

to Francine but argues it applies to the other defendants.

#### a.  The LLCs

The defendants argue alter ego does not apply to LLCs because under Nevada law a

charging order is the exclusive remedy for a judgment creditor to attach an LLC member's

interest in the LLC.  Transfirst suggests I assume without deciding that an LLC can be pierced.

Alternatively, it argues LLCs are subject to alter ego analysis.

The Supreme Court of Nevada has twice assumed, without deciding, that alter ego can

apply to LLCs. *See JSA, LLC v. Golden Gaming, Inc.*, No. 58074, 2013 WL 5437333, at *5 (Nev.

Sept. 25, 2013); *Webb v. Shull*, 270 P.3d 1266, 1271 n.3 (Nev. 2012).  Because the Supreme

Court of Nevada has not decided this issue of Nevada law, I must predict what it would do. *Credit

Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1126 (9th Cir. 2005).

Federal courts applying Nevada law have ruled that the alter ego theory applies to LLCs.

*See Guy v. Casal Inst. of Nev., LLC*, No. 2:13-cv-02263-APG-GWF, 2015 WL 56048, at *2 (D.

Nev. Jan. 5, 2015); *In re Giampietro*, 317 B.R. 841, 845-46 (Bankr. D. Nev. 2004) (predicting

that Nevada would extend alter ego to LLCs).  *Giampietro* reasoned that the "varieties of fraud

and injustice that the alter ego doctrine was designed to redress can be equally exploited through

limited liability companies," so Nevada courts would extend the doctrine to LLCs. 317 B.R. at

846.

However, these courts did not address the defendants' argument in this case that NRS

§ 86.401 statutorily provides that a charging order is the exclusive remedy for a judgment creditor

against an LLC member's interest in the LLC.  That statute states:

1. On application to a court of competent jurisdiction by any judgment creditor of a member, the court may charge the member's interest with payment of the unsatisfied amount of the judgment with interest. To the extent so charged, the judgment creditor has only the rights of an assignee of the member's interest.

2. This section:

(a) Provides the exclusive remedy by which a judgment creditor of a member or an assignee of a member may satisfy a judgment out of the member's interest of the judgment debtor, whether the limited-liability company has one member or more than one member. No other remedy, including, without limitation, foreclosure on the member's interest or a court order for directions, accounts and inquiries that the debtor or member might have made, is available to the judgment creditor attempting to satisfy the judgment out of the judgment debtor's interest in the limited-liability company, and no other remedy may be ordered by a court.

Under a charging order, a judgment creditor is entitled to only "the judgment debtor's share of the profit and distributions, takes no interest in the LLC's assets, and is not entitled to participate in the management or administration of the business." *Weddell v. H2O, Inc.*, 271 P.3d 743, 750 (Nev. 2012). The theory that the charging order is the exclusive remedy "reflects the principle that LLC members should be able to choose those members with whom they associate." *Id.*

I predict that, despite this statute, the Supreme Court of Nevada would hold that LLCs are subject to alter ego under the appropriate circumstances. It is questionable whether the statute even applies given the facts in this case. Dominic is not a member of any of the LLC defendants, so Transfirst is not seeking to satisfy the judgment out of a member's interest in the LLCs. Thus this situation does not fall within the statute's terms. Instead, Transfirst is asserting the LLCs are shams and thus essentially non-entities. *Cf. Wood v. Elling Corp.*, 572 P.2d 755, 762 (Cal. 1977) ("If it were alleged and proven that the two trusts in question were themselves alter egos of the Wenckes, those trusts would essentially drop out as independent legal entities . . . .").

Moreover, alter ego is an equitable doctrine aimed at doing justice. *LFC Mktg. Grp.*, 8 P.3d at 845-46. The defendants have not suggested any reason why Nevada would prohibit its citizens from abusing the corporate form and using a corporation as an instrumentality of fraud but allow that same conduct through an LLC. *See Giampietro*, 317 B.R. at 846. There may be situations where it would be inequitable to apply alter ego to an LLC, such as where the policy concerns expressed in *Weddell* about forced association would come into play. But here, if the

LLCs are Dominic's alter egos, no such concerns arise. I therefore will apply alter ego analysis to the LLC defendants.

### b. The Partnerships

The defendants argue the alter ego doctrine does not apply to partnerships because the general partner is always liable for the partnership's debts to third parties. But that does not address whether the partnership can be an alter ego for someone else entirely. As Dominic is neither a limited nor general partner for either partnership defendant, a general partner's liability for partnership debts does not resolve the issue in this case.[4]

The Supreme Court of Nevada has not expressly decided whether alter ego applies to partnerships. The court addressed issues surrounding an alter ego finding against a limited partnership in *Sunrise Sec. Corp. v. Anzalone*, 281 P.3d 1223 (Nev. 2009) (unpublished). However, there is no indication in that case that the court was confronted with the argument that alter ego should not apply to partnerships.

For the same reasons discussed above regarding LLCs, I predict the Supreme Court of Nevada would apply alter ego to partnerships where justice required it. As with LLCs, there may be times when it would be inequitable to apply alter ego to a partnership (e.g., where that would force a third party to be partners with someone with whom it did not choose to associate itself). But to hold that alter ego never applies to a partnership may countenance a fraud. As with LLCs, the defendants have not suggested any reason why Nevada would prohibit its citizens from abusing the corporate form and using it as an instrumentality of fraud but allow that same conduct through a partnership. *See Giampietro*, 317 B.R. at 847 ("Nowhere in the legislative minutes or other scraps of legislative history . . . is there any indication of an intent to tighten or clarify alter ego liability for corporations while eliminating it for limited liability companies or any other limited liability entity (such as limited partnerships, limited-liability partnerships or limited-

---

[4] However, if the partnership is Dominic's alter ego and thus liable for his debt, then the partnership's general partner may be liable for that debt as well.

liability limited partnerships).").  I therefore will apply alter ego analysis to the partnership defendants.

### c. The Trusts

The defendants argue alter ego does not apply to a trust because a trust is not an entity. Transfirst contends that Ninth Circuit and California law support piercing a trust, so I should predict that Nevada likewise would do so.

The Supreme Court of Nevada has not addressed whether a trust can be an alter ego.[5]  As with LLCs and partnerships, I predict the Supreme Court of Nevada would apply alter ego to trusts if justice required it.  Under California law, it is "well-settled that a trust created for the purpose of defrauding creditors or other persons is illegal and may be disregarded." *In re Schwarzkopf*, 626 F.3d 1032, 1037 (9th Cir. 2010) (quotation omitted) (citing California authority and finding trusts were alter egos); *see also Wood*, 572 P.2d at 762 ("If it were alleged and proven that the two trusts in question were themselves alter egos of the Wenckes, those trusts would essentially drop out as independent legal entities . . . .").  "Where Nevada law is lacking, its courts have looked to the law of other jurisdictions, particularly California, for guidance." *Eichacker v. Paul Revere Life Ins. Co.*, 354 F.3d 1142, 1145 (9th Cir. 2004) (quotation omitted).  Moreover, the defendants have not given any reason why Nevada would countenance a sham, regardless of its form.  For all the reasons discussed above with respect to LLCs and partnerships, and in light of California and Ninth Circuit authority, I will apply alter ego analysis to the trust defendants.

### 3.  Transfirst Has Shown a Likelihood of Success on Alter Ego.

To show alter ego, the plaintiff must establish by a preponderance of the evidence that (1) the corporation is "influenced and governed by the person asserted to be the alter ego"; (2) there is "such unity of interest and ownership that one is inseparable from the other"; and (3) "adherence to the corporate fiction of a separate entity would, under the circumstances, sanction

---

[5] In an unpublished disposition with no citation to authority, the Ninth Circuit affirmed a finding that an individual was the alter ego of a trust in a case arising out of Nevada. *Walsh v. Kelly*, 166 F.3d 1219 (9th Cir. 1999) (unpublished).  It does not appear from the decision that the defendant in that case argued that a trust cannot be an alter ego.

[a] fraud or promote injustice." *LFC Mktg. Group.*, 8 P.3d at 846-47 (quotation omitted); *see also* Nev. Rev. Stat. § 78.747 (providing that stockholders, officers, or directors of a corporation are not liable for corporate debts unless they are the corporation's alter egos and codifying the three-part test of influence, unity of ownership, and sanctioning a fraud). The following factors, "though not conclusive, may indicate the existence of an alter ego relationship: (1) commingling of funds; (2) undercapitalization; (3) unauthorized diversion of funds; (4) treatment of corporate assets as the individual's own; and (5) failure to observe corporate formalities." *LFC Mktg. Grp.*, 8 P.3d at 847. There is "no litmus test for determining when the corporate fiction should be disregarded; the result depends on the circumstances of each case." *Polaris Indus. Corp. v. Kaplan*, 747 P.2d 884, 887 (Nev. 1987).

The defendants argue that Transfirst cannot show alter ego because Dominic and Francine entered into two transmutation agreements in 2000 and 2006 which, for purposes of the preliminary injunction hearing, Transfirst concedes were not fraudulent. Under the transmutation agreements, the Magliarditis agreed to convert all of their community property into Francine's separate property. ECF Nos. 81-4 at 21-22; 81-5 at 5-6; Defs.' Hrg Exs. 501-02. The defendants argue that from that point on, all property (including all of the entity defendants' property) was and is Francine's separate property which she is free to use as she pleases, including making purchases on Dominic's behalf. According to the defendants, there consequently was no unity of ownership because Dominic no longer owned the property. The defendants also argue that even if the transmutation agreements do not end the matter, Dominic did not influence or control the entities because Francine testified she made the decisions as to when a distribution from the companies should be made and she used Dominic as a bookkeeper to determine from which entities to make a distribution. Finally, they contend there is no fraud or injustice because the mere fact that Transfirst has gone unpaid is insufficient. They argue that the fact that Francine chooses to fund Dominic's personal expenses out of her separate property does not sanction a fraud where those entities who hold her separate property were set up legitimately.

1    Transfirst responds that even if the transmutation agreements are valid, Nevada law does

2    not require Dominic to own the companies or their assets for alter ego to apply.  Transfirst argues

3    the evidence shows that although Francine nominally was president or trustee of the various

4    entities, she knew nothing about them, their assets, or their purported business because Dominic

5    handled everything, including decisions about what distributions to make, to whom, in what

6    amounts, and from what entities.  Transfirst contends failing to pierce the various entities would

7    sanction a fraud because Dominic has used the entities to shield his assets from collection on the

8    judgment.

9    Transfirst has shown a likelihood of success on the merits regarding alter ego.  The

10   evidence shows Dominic influenced and governed the entities.  Until August 2015, Dominic was

11   the president of defendants DII Capital, Inc. and ATM Enterprises, LLC.  He then resigned and

12   Francine took over as president.[6] ECF No. 7-2 at 33-34; Pls.' Hrg. Exs. 23, 24.  Although

13   Dominic resigned as president, practically speaking nothing changed.  He remained in control of

14   the entities' assets.  Although he testified he had completely removed himself from DII Capital

15   post-resignation, Francine testified that even after he resigned, Dominic was better qualified to

16   testify about DII Capital and ATM's transactions. ECF Nos. 105 at 27; 7-13 at 31, 35; 105 at 38.

17   Francine testified she was in control of the entities but she knew nothing about the entities'

18   businesses or assets,[7] and when she needed money, she asked Dominic for it and he decided from

19   which company the funds were drawn. ECF Nos 7-13 at 22, 28-29; 105 at 46; 106 at 48-49.

---

[6] The Magliarditis gave conflicting reasons as to why Dominic resigned.  He testified she was not
pleased with document requests from Transfirst. ECF No. 106 at 26-27.  She testified he was "fed up" with
Transfirst. *Id.* at 58.  She denied that she even knew about the document requests from Transfirst. *Id.* at
59-60.

[7] *See, e.g.*, ECF No. 7-13 at 25 (Francine testifies she does not know if she manages DFM
Holdings), *id.* at 31-32 (she does not know if DII Capital offers products or services), *id.* at 37-38 (she
does not know whether ATM offers products; she believes it is a credit card processing company but she
does not know what that means), *id.* at 39-40 (she states DII Capital is involved in real estate deals but she
does not know anything more about it and could not identify any property it owns), *id.* at 43-44 (she does
not know whether DII Capital has any investment or securities accounts and agrees she does not know
much about ATM or DII Capital); ECF No. 83 at 232-33 (she would give similar answers about lack of
knowledge regarding other entity defendants); *see also* ECF No. 105 at 35, 37, 39-40.

Dominic used the entities' funds to pay his own personal expenses, including gym memberships and flying lessons, with payments coming directly from corporate accounts. *See, e.g.*, ECF Nos. 7-5 at 2-50; 7-6 at 1-21; 84 at 6; 105 at 9-10. He also deposited funds into, and transferred funds between, the companies in unexplained deposits and transactions and undocumented loans. *See, e.g.*, ECF No. 7-2 at 35 [Pls.' Hrg. Ex. 25] (ATM balance sheet showing intercompany receivables and loans nearing $2 million); ECF No. 7-2 at 43-50 and ECF No. 7-3 at 1-20 [Pls.' Hrg. Ex. 26] (ATM ledger showing hundreds of thousands of dollars in unexplained deposits and transfers, and undocumented loans between ATM and DII Capital); ECF No. 7-4 at 7-37 [Pls.' Hrg. Ex. 28] (DII Capital ledger showing hundreds of thousands of dollars in unexplained deposits and transfers, and undocumented loans); Pls.' Hrg. Ex. 27 (DII Capital balance sheet showing over $3 million in intercompany payables). Indeed, most deposits (many of which are in the tens of thousands of dollars) have no information regarding the source of those funds. Francine testified she did not know that information nor did she know whether Dominic failed to describe the transactions in the ledgers in order to hide the source of funds coming in to ATM. ECF No. 84 at 49-54. Thus, Transfirst has shown a likelihood of success in demonstrating that Dominic commingled funds, diverted them, treated entity assets as his own, and failed to observe corporate formalities.

As to unity of interest and ownership, each of the companies and trusts is owned nominally by Francine. However, an ownership interest is not required to show alter ego under Nevada law. *LFC Mktg. Grp.*, 8 P.3d at 847 ("Although ownership of corporate shares is a strong factor favoring unity of ownership and interest, the absence of corporate ownership is not automatically a controlling event. Instead, the circumstances of each case and the interests of justice should control." (quotation omitted)); *see also* Nev. Rev. Stat. § 78.747 (applying alter ego to officers and directors as well as stockholders). Thus, assuming the transmutation agreements are valid, the fact that Dominic does not own any of the property does not end the matter. For example, in *LFC Marketing*, the Supreme Court of Nevada affirmed an alter ego finding even though the sole shareholder of the corporation was the judgment debtor's brother. 8 P.3d at 843,

847. Here, Dominic "acted as the ultimate authority for all of [the entities'] dealings." *Id.* at 847. He managed all transactions and accounts, paid his personal expenses out of corporate accounts, and determined from which entities to make distributions.

Finally, Transfirst has shown that adherence to the corporate fiction of a separate entity would sanction a fraud because Dominic is using these entities to shield his assets from a substantial judgment while he helps himself to the entities' assets. Transfirst has been unable to recover its judgment against Dominic for years, despite Dominic having virtually unfettered control over substantial assets. The evidence shows Dominic has arranged the transactions (including hundreds of thousands of dollars in unexplained deposits and transfers) and undocumented loans to frustrate and impede Transfirst's collection efforts. Transfirst also has shown a likelihood of success in demonstrating Francine is not an innocent property owner who would be harmed by piercing the veil. Francine knew about the judgment but nevertheless placed Dominic in control of all entity assets. She admits she could require Dominic to explain each of the transfers in the various ledgers but she does not want to do so. Transfirst has shown Francine has, at a minimum, enabled Dominic's efforts to evade the judgment. Consequently, Transfirst has shown a likelihood of success on the merits of its alter ego claim.

**B. Fraudulent Transfers**

Nevada's Uniform Fraudulent Transfer Act ("NUFTA") provides several different means for a creditor to establish a transfer was fraudulent.[8] Under Nevada Revised Statutes § 112.180(1), a transfer is fraudulent as to a creditor regardless of whether the creditor's claim arose before or after the transfer, if the debtor made the transfer:

> (a) With actual intent to hinder, delay or defraud any creditor of the debtor; or
> (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

---

[8] The defendants argue Nevada law applies to the fraudulent transfer claims. Transfirst does not concede the issue. The parties have not identified any relevant differences between Nevada and Texas fraudulent transfer law that would impact my ruling on the motion for a preliminary injunction. I therefore apply Nevada law at this stage of the proceedings.

(1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(2) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

In determining whether the debtor acted with actual intent under § 112.180(1)(a), the fact finder may consider whether:

(a) The transfer or obligation was to an insider;

(b) The debtor retained possession or control of the property transferred after the transfer;

(c) The transfer or obligation was disclosed or concealed;

(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(e) The transfer was of substantially all the debtor's assets;

(f) The debtor absconded;

(g) The debtor removed or concealed assets;

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Id.* § 112.180(2).

Alternatively, a transfer may be fraudulent as to a creditor whose claim arose before the transfer if the debtor did not receive reasonably equivalent value in exchange for the transfer and the debtor was insolvent or became insolvent as a result of the transfer. *Id.* § 112.190(1). Finally, a transfer may be fraudulent as to a creditor whose claim arose before the transfer if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at the time of the transfer, and the insider had reasonable cause to believe the debtor was insolvent. *Id.* § 112.190(2). The "creditor bears the burden of proving the debtor was insolvent and the consideration was inadequate." *Pat Clark Sports, Inc. v. Champion Trailers, Inc.*, 487 F. Supp. 2d 1172, 1178 (D. Nev. 2007).

1      ### 1.  The entities are debtors under NUFTA.

2          The defendants argue Transfirst has not shown a likelihood of success on the merits of its

3      fraudulent transfer claims because the entities are not "debtors" under NUFTA as they are not

4      parties to the judgment.  A "debtor" is "a person who is liable on a claim." Nev. Rev. Stat.

5      § 112.150(6).  As discussed above, Transfirst has shown a likelihood of success on the merits that

6      the entities are Dominic's alter egos and thus has also shown they are debtors under NUFTA.

7      ### 2.  Alter egos may make "transfers" amongst themselves.

8          The defendants contend that if the entities are Dominic's alter egos, then inter-company

9      transactions are not "transfers" because those transactions did not dissipate Dominic's assets.

10     Under NUFTA, a "transfer" is "every mode, direct or indirect, absolute or conditional, voluntary

11     or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes

12     payment of money, release, lease and creation of a lien or other encumbrance." Nev. Rev. Stat.

13     § 112.150(12).  Dominic does not cite any law for the proposition that a transfer to or between

14     alter egos does not qualify as a transfer for purposes of the statute.  The statute's discussion of the

15     badges of fraud for actual intent to hinder, delay, or defraud a creditor suggests the statute reaches

16     alter ego transfers.  For example, the statute considers whether the debtor retained possession or

17     control of the property after the transfer and whether the debtor removed or concealed assets. *Id.*

18     §§ 112.180(2)(b), (g).  Further, when Dominic moved funds between entities he was disposing of

19     them as to each entity.  Regardless of whether the entities are ultimately found to be Dominic's

20     alter egos, movement of funds between the entities' bank accounts actually took place and thus

21     those funds were transferred within the statute's meaning.

22     ### 3.  Transfirst Has Shown a Likelihood of Success on Fraudulent Transfer.

23         Transfirst has shown a likelihood of success on the merits of its claims that Dominic,

24     through the alter egos, transferred funds with the actual intent to delay, hinder, or defraud

25     Transfirst in its efforts to collect on the judgment.  The transfers bear many of the badges of fraud

26     identified in the statute.  The transfers were to insiders, as the transfers were between entities

27     nominally owned by Francine but controlled by Dominic.  Dominic retained control over the

28

entities and their funds. The transfers were concealed through unexplained deposits and transfers, and undocumented loans. Before the transfers at issue, Dominic had been sued by Transfirst and many transfers were made after judgment was entered. As to insolvency, Dominic claims to have no assets himself, although he regularly causes the entities to pay his personal expenses. Because many transactions are undocumented, there is no evidence of an exchange of reasonably equivalent value. Finally, Dominic withdrew nearly all the funds in DII Capital and ATM's accounts at Merrill Lynch just days before Francine was scheduled for a deposition on behalf of herself, DII Capital, and ATM.[9] A federal judge has already found that Dominic purposefully provided false testimony in the underlying lawsuit and engaged in post-judgment discovery abuses. Transfirst thus has shown a likelihood of success that the undocumented intercompany deposits, transfers, and loans were made with the intent to hinder, delay, or defraud Transfirst.

Transfirst also has shown a likelihood of success on the merits that transfers made from the entities to Francine were fraudulent. Deposits in the tens of thousands of dollars were made

---

[9] *See* ECF No. 104 at 464 (DII Capital Merrill Lynch account in December 2015 with a balance of $845,173.15), *id.* at 484 (same with a January 2016 balance of $486,952.44), *id.* at 502 (same with February 2016 balance of $5,336.82), *id.* at 509 (showing withdrawal on February 4, 2016 in the amount of $272,253.35 and another on February 2016 in the amount of $210,000), *id.* at 833 (ATM Merrill Lynch account with January 2016 balance of $314,122.96), *id.* at 845 (same with February balance of $4,624.45), *id.* at 851 (transfer out of $520,000 on February 16, 2016); Pls.' Hrg. Exs. 33, 35, 37. *See also* ECF No. 7-2 at 13 (Francine's deposition scheduled for February 18 and 19, 2016). I consider this last exhibit solely for the date the deposition was scheduled and not for any statements made in the transcript. *See also Transfirst Holdings, Inc. v. Magliarditi*, 2:16-cv-00322-APG-NJK, ECF No. 23-1 at 9 (email from Francine's counsel scheduling the deposition for February 18 and 19, 2016).

The defendants objected at the hearing to my consideration of the Merrill Lynch documents, which were presented for the first time in the reply brief. The defendants contend Transfirst could have obtained these documents sooner and thus there is no excuse for Transfirst waiting until the reply brief to file them. There is some reference to Merrill Lynch accounts in the documents the defendants produced earlier. *See* ECF No. 7-4 at 44-45. However, the defendants have not shown that the actual Merrill Lynch account statements were disclosed. The defendants refer me to the affidavit of Matthew R. Carlyon in a related case. However, that affidavit states only that 1,500 pages have been disclosed. *See Transfirst Holdings, Inc. v. Magliarditi*, 2:16-cv-00322-APG-NJK, ECF No. 23-1 at 19. The index attached to the declaration does not identify any Merrill Lynch documents. *Id.* at 24-26. Both Dominic and Francine stated at their respective depositions that they did not know about any investment accounts for DII Capital or ATM, despite the fact that both entities had Merrill Lynch accounts with sizeable balances. *See* ECF Nos. 7-13 at 43; 104 at 10; 105 at 19. Moreover, these are the defendants' own investment accounts. They can hardly be surprised by evidence that the accounts had substantial balances and nearly all the funds were withdrawn in early 2016. I therefore consider the Merrill Lynch account documents.

into the entity accounts with no identification of the source of these funds. The funds were placed into the entities' accounts and then distributed to Francine, purportedly as her separate property under the transmutation agreements. The defendants' refusal to explain the sources of the funds, particularly in light of all of the other evidence recounted above, leads to the reasonable inference that the funds are Dominic's that have been fraudulently transferred to Francine through the entities to evade paying the judgment.

Finally, Transfirst has shown a likelihood of success on the merits of showing that the transfers were fraudulent under § 112.190(1). As discussed above, there is no evidence the entities received reasonably equivalent value in exchange for any particular transfer because the transfers are unexplained and undocumented. Additionally, because the entities are Dominic's alter egos, and Dominic was not paying his debts as they became due, the transfers were made when Dominic was insolvent. *See also* Nev. Rev. Stat. § 112.160 (defining insolvency and removing from consideration as the debtor's assets "property that has been transferred, concealed or removed with intent to hinder, delay or defraud creditors or that has been transferred in a manner making the transfer voidable under this chapter").

## III. LIKELIHOOD OF IRREPARABLE INJURY

Tranfirst has demonstrated a likelihood of irreparable injury. Although Transfirst already has a money judgment, it has been frustrated in collecting on that judgment. Dominic's prior conduct in the Texas action as well as the evidence that the entity defendants are alter egos suggests the judgment will continue to go unpaid. ECF No. 53 at 8; *see also* ECF No. 7-1 at 9 (Texas order finding Dominic "gave false testimony concerning material matters before the court with the willful intent to provide false testimony to the court and with the intent to influence the proceedings . . ."). Additionally, Transfirst has shown a likelihood that Dominic is dissipating assets, as shown by the withdrawal of funds from the DII Capital and ATM Merrill Lynch accounts just before Francine's deposition, as well as the tens of thousands of dollars in personal expenses paid out of the company accounts. *See Connecticut Gen. Life Ins. Co. v. New Images of*

1   *Beverly Hills*, 321 F.3d 878, 881 (9th Cir. 2003) (stating the dissipation of assets may constitute

2   irreparable harm).

3   **IV.  BALANCE OF HARDSHIPS**

4       The balance of hardships tips in Transfirst's favor.  Transfirst has been unable to collect

5   on its judgment for years.  The defendants have not identified any particular harm they would

6   suffer if I grant the preliminary injunction, nor have they presented any evidence in support.

7   Although the TRO has been in place for months, the defendants have not asked for a single

8   distribution, demonstrating they have other sources of funds to live on.  Should it become

9   necessary, the defendants may seek leave of court to distribute specific funds for specific

10  purposes upon a showing of good cause.  Finally, any harm to the defendants has been caused by

11  Dominic's recalcitrant and contumacious conduct in refusing to pay a lawful judgment.

12  **V.  PUBLIC INTEREST**

13      The public has an interest in ensuring that judgments issued by courts and affirmed on

14  appeal are enforced, and in preventing judgment debtors from unlawfully transferring and otherwise

15  dissipating assets instead of paying their judgment creditors.  The public interest therefore

16  weighs in favor of granting the preliminary injunction.

17  **VI.  RECEIVER**

18      Transfirst requests that I appoint a receiver.  Whether to appoint a receiver is governed by

19  federal law, even in a diversity action. *Canada Life Assur. Co. v. LaPeter*, 563 F.3d 837, 842-43

20  (9th Cir. 2009); Fed. R. Civ. P. 66.  Whether to appoint a receiver lies within my discretion. *Id.* at

21  844.  "[A]ppointing a receiver is an extraordinary equitable remedy, which should be applied with

22  caution." *Id.* (quotation omitted).  In making that decision, I consider a variety of factors,

23  including:

24      (1) whether [the party] seeking the appointment has a valid claim; (2) whether
        there is fraudulent conduct or the probability of fraudulent conduct, by the
25      defendant; (3) whether the property is in imminent danger of being lost, concealed,
        injured, diminished in value, or squandered; (4) whether legal remedies are
26      inadequate; (5) whether the harm to plaintiff by denial of the appointment would
        outweigh injury to the party opposing appointment; (6) the plaintiff's probable
27      success in the action and the possibility of irreparable injury to plaintiff's interest

28

in the property; and, (7) whether [the] plaintiff's interests sought to be protected will in fact be well-served by receivership.

*Id.* (quotations omitted). However, "there is no precise formula" and "no one factor is dispositive." *Id.* at 845.

I decline to appoint a receiver at this time because Transfirst has not shown that an injunction alone will not suffice to secure the defendants' assets. There is no evidence before me, for example, that the defendants have ongoing business operations that need to continue but which risk the diversion of funds to the defendants if a receiver is not appointed. A receiver's cost therefore likely would outweigh the benefits. Accordingly, Transfirst's request for a receiver is denied without prejudice.

## VII. BOND

The defendants request I increase the amount of the bond equal to the amount that will be frozen by the injunction. However, a bond is meant to address "the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The defendants have not submitted any evidence as to what damages they might incur if wrongfully enjoined. The defendants have not identified any particular harm they may suffer and they have not presented any evidence in support. *See Connecticut Gen. Life Ins. Co.*, 321 F.3d at 882 (stating "the bond amount may be zero if there is no evidence the party will suffer damages from the injunction"). I therefore decline to increase the bond at this time.

## VIII. CONCLUSION

For the reasons herein stated, the plaintiffs' motion for a preliminary injunction **(ECF No. 6) is GRANTED** as to defendants Dominic J. Magliarditi; Francine Magliarditi in her individual capacity and in her capacity as trustee for FRM Trust, DJM Irrevocable Trust, and Fane Trust; DII Capital, Inc.; ATM Enterprises, LLC; Spartan Payment Solutions, LLC; DFM Holdings, Ltd.; and DFM Holdings, LP.

I HEREBY ORDER:

1. Dominic J. Magliarditi; Francine Magliarditi in her individual capacity and in her capacity as trustee for FRM Trust, DJM Irrevocable Trust, and Fane Trust; DII Capital, Inc.;

1   ATM Enterprises, LLC; Spartan Payment Solutions, LLC; DFM Holdings, Ltd.; and DFM

2   Holdings, LP; and their officers, agents, servants, employees, and attorneys, and all other persons

3   in active concert with the identified parties in this subparagraph (collectively the "Enjoined

4   Defendants"), are enjoined from, directly or indirectly: (1) transferring, concealing, withdrawing,

5   or otherwise disposing of any assets, property, or funds that they control or possess; (2) opening

6   or closing accounts; (3) opening or accessing safe deposit boxes or rental storage units; and (4)

7   opening or creating any new entities or trusts without prior approval of the court; and

8        2.     The plaintiffs are authorized to notify financial institutions and other persons who

9   may control or possess property, funds, and assets belonging to, or held for the benefit of, any

10  Enjoined Defendant, of the existence of this preliminary injunction, so that the plaintiffs can

11  obtain an honest accounting of the Enjoined Defendants' property and assets and the value

12  thereof.

13       IT IS SO ORDERED this 24th day of May, 2017.

15                                         ANDREW P. GORDON
                                           UNITED STATES DISTRICT JUDGE